IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LAVONNE ARTHUR ROSTON                                                    PLAINTIFF

v.                              Case No. 4:24-cv-00336-LPR

CITY OF MCGEHEE                                                          DEFENDANT

<u>ORDER</u>

This case concerns alleged employment discrimination.  Pending before the Court is Defendant City of McGehee's Motion for Summary Judgment.[1]  At oral argument, Plaintiff Lavonne Roston abandoned all his claims except for two: (1) pay discrimination under Title VII and (2) pay discrimination under the Arkansas Civil Rights Act.[2]  The standards governing each of these two claims are the same, at least for purposes of summary judgment.[3]  Accordingly, the Court addresses both claims at the same time.  And, for the reasons discussed below, the Court GRANTS the City of McGehee's Motion for Summary Judgment.

## I.  Background

To understand the background of this case, it is necessary to understand that there is some relationship between the City of McGehee and the Clearwater Paper Mill when it comes to EMTs and Paramedics.  In broad strokes, the first aid station at the Paper Mill is primarily (although not exclusively) staffed by EMTs and paramedics who are employees of the City of McGehee Fire and

---

[1] Def.'s Mot. for Summ. J. (Doc. 13).

[2] *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:08:41–9:16:02.  One could say either that Mr. Roston abandoned certain claims or that Mr. Roston conceded the property of summary judgment with respect to those claims.  In practical terms, and in the context of this case, the distinction makes little difference.  Those claims will not proceed to trial.

[3] *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) ("[The Court] analyze[s] . . . Title VII and Arkansas Civil Rights Act claims under the same standards."); *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009) ("We consider first the district court's grant of summary judgment on the Title VII and ACRA claims, which are governed by the same standards.").

Ambulance Service.[4]  City employees who volunteer for shifts at the Paper Mill are paid for that work through checks issued by the City with funds provided to the City by the Paper Mill.[5]  The pay checks for the Paper Mill work are separate from the City employees' normal pay checks.[6]

Our story begins in earnest in 2020, when Mr. Roston began working part-time as an EMT at the Paper Mill.[7]  At this point, Mr. Roston was working only for the Paper Mill and not for the City of McGehee.[8]  He was hired directly by the Paper Mill.[9]  And his pay was set by Eddie Allen.[10]  Mr. Allen was the former City Fire Chief and the current supervisor of the Paper Mill's first aid station.[11]  Mr. Roston's initial pay at the Paper Mill was $17.00 per hour.[12] Mr. Roston agrees that his rate of pay during this time period was fair and not discriminatory.[13] He is not challenging it.[14]

---

[4] The particulars of how this is accomplished are heavily disputed by the parties.  *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶¶ 1–3.  At the summary judgment stage, the Court must read the record in a very specific way.  The Court is bound to accept as true all undisputed facts.  *See* FED. R. CIV. P. 56(a); *Wilson v. Ark. Dep't of Hum. Servs.*, No. 4:22-cv-00775-LPR, 2025 WL 1970239, at *1 (E.D. Ark. July 16, 2025) ("If a fact is undisputed—or not genuinely disputed—the Court adopts it.").  As to disputed facts, the Court must determine whether the dispute is genuine.  *Id.*  A dispute is genuine if there is evidence in the record from which a reasonable jury could find the fact in favor of either party.  *See Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023); *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022).  A dispute is not genuine if, based on the evidence in the record, all reasonable juries would find the fact in favor of a particular party.  *See Torgerson v. Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  If the fact dispute is not genuine, the Court treats the undisputably correct version of the fact as true.  If the fact dispute is genuine, the Court accepts as true the version of the genuinely disputed fact that is most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Having ascertained the facts as just described, the Court then takes all reasonable inferences from those facts in favor of the non-moving party.  *See id.*

[5] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶¶ 2–3.

[6] *See id.* ¶ 2.

[7] *See id.* ¶¶ 1, 9; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 23.

[8] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 9.

[9] *See id.*

[10] *See id.*; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 23, 56 (discussing initial pay grade of $17.00 per hour and subsequent "bump up to $17.50" per hour).

[11] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 4.

[12] *See id.* ¶¶ 6, 9; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 23, 56.

[13] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 10.

[14] *See id.*

In August of 2022, Mr. Roston was hired directly by the City of McGehee as a part-time EMT/Firefighter.[15]  During the time period from August of 2022 to May of 2023, Mr. Roston took a few shifts at the Paper Mill.[16]  In 2022, he was still earning $17.00 per hour for his shifts at the Paper Mill.[17]  In 2023, his rate of pay for those shifts was bumped up (by Mr. Allen) to $17.50 per hour.[18]  In May of 2023, Mr. Roston became a full-time EMT/Firefighter for the City.[19]  His full-time pay was $11.44 per hour.[20]  Mr. Roston is not challenging his pay from this period as unfair or discriminatory.

Mr. Roston's pay discrimination allegations are limited to an approximately two-week window in August of 2023.[21]  Sometime between July and August of 2023, McGehee City Fire Chief Rick Terry asked Mr. Roston to pick up shifts at the Paper Mill.[22]  Chief Terry told Mr. Roston that there was a new contract between the Paper Mill and the City and that, if Mr. Roston "worked on that contract," Mr. Roston "would be compensated $25.50 an hour."[23]  Chief Terry also told Mr. Roston that Chief Terry "was in charge of setting the rates of pay for the

---

[15] *See id.* ¶ 12.

[16] *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 27.

[17] *See id.* at 23, 56; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 15.

[18] *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 23, 56; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 15.

[19] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 12.

[20] *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 19.

[21] *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:45:57–9:47:32.  For whatever reason, Mr. Roston did not pick up shifts at the Paper Mill from the beginning of May 2023 through the beginning of August 2023.  *See* Ex. 7 (Roston Pay Records) to Def.'s Statement of Undisputed Material Facts (Doc. 15-7) at 1–2.

[22] *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:55:06–9:55:40.

[23] Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 21.  The City sets forth a different version of what Chief Terry told Mr. Roston.  Under the City's version, Chief Terry was simply telling Mr. Roston that Chief Terry was trying to get the Paper Mill to agree to a certain hourly rate under a new contract. *See* Def.'s Statement of Undisputed Facts (Doc. 15) ¶ 18; Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 8.  But the content of what the Chief said to Mr. Roston is a genuinely disputed fact and so, for now, the Court must adopt the version of that fact most favorable to Mr. Roston.  *See Anderson*, 477 U.S. at 255.

EMTs and paramedics that work at [the Paper Mill] . . . ."[24]  In reliance on what Chief Terry said, Mr. Roston picked up some shifts at the Paper Mill.[25]  But, when Mr. Roston received the check for his work, it reflected a pay rate of only $17.50 per hour.[26]  It is this pay deficiency that Mr. Roston claims as discrimination.[27]

On or around August 11, 2023, Mr. Roston went to talk to Chief Terry about the discrepancy between what Mr. Roston was promised and what Mr. Roston received.[28]  Chief Terry told Mr. Roston that Chief Terry "had nothing to do with it, that the safety man [at the Paper Mill] had informed him that EMTs and medics could not be paid the same rate, . . . and [that] there was nothing [the Chief] could do about it."[29]  Unsatisfied with this response, Mr. Roston turned in a letter of resignation on or around August 18, 2023.[30]  "[S]hortly after" Mr. Roston had stopped working at the City of McGehee, the secretary for the Mayor called Mr. Roston and "told [him]

---

[24] Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 26.  The City strenuously contends that the Paper Mill, and not the City, sets the pay rates at issue.  *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 2, 7–8; Def.'s Statement of Undisputed Facts (Doc. 15) ¶¶ 2, 23.  But, given Mr. Roston's deposition testimony, that is a genuinely disputed fact.  Taking all inferences in the light most favorable to Mr. Roston, the Court reads the relevant portion of Mr. Roston's deposition testimony as saying that Chief Terry told Mr. Roston that Chief Terry set the pay rates at issue.  And a statement by Chief Terry to that effect is certainly evidence from which a reasonable jury could conclude that the City set the pay rates at issue—either exclusively or in tandem with the Paper Mill.

[25] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶¶ 18–24; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 21–22.

[26] *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 21–22.

[27] *See* Compl. (Doc. 1) ¶¶ 7, 14–15; Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 3, 5–7.

[28] *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 21.

[29] Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 22.

[30] *See id.* at 42; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶¶ 29–30; Ex. 9 (Roston Resignation Letter) to Def.'s Statement of Undisputed Material Facts (Doc. 15-9) at 1–2.

they needed someone [to work] out at the mill, [and] that if [Mr. Roston] could work[,] that they were paying the $25.50 an hour."[31]  Apparently, she did not know yet that Mr. Roston had quit.[32]

## II. Analysis

Mr. Roston is black.[33]  He contends that his skin color is the reason he was paid $17.50 per hour (instead of $25.50 per hour) for his work at the Paper Mill in August of 2023.[34]  The City disagrees.  The City contends that, in early August of 2023, the City was in active negotiations with the Paper Mill regarding what the Paper Mill would pay City EMTs and paramedics under a new contract.[35]  The City contends that, at the time Mr. Roston picked up the shifts at the Paper Mill, the City had not yet persuaded the Paper Mill to pay $25.50 per hour.[36]  According to the City, that is why Mr. Roston received his old rate of pay as opposed to the $25.50 per hour.[37]

Neither party suggests that there is direct evidence of racial discrimination in this case. That means that, under binding precedent, the Court must use the *McDonnell-Douglas* burden shifting framework.[38]  And, in this case, the only *prima facie* prong in serious dispute is whether

---

[31] Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 42.  We do not know the specific amount of time between Mr. Roston quitting and his receipt of this phone call.  But we do know that, at the time of the call, the Mayor's secretary was unaware that Mr. Roston had quit.  *See id.* at 41–42.  It is reasonable to infer from this fact that the call took place no more than a week or two after Mr. Roston quit.

[32] *See id.* at 42.

[33] *See id.* at 46.

[34] *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 5–8.

[35] *See* Reply Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 24) at 2–3.

[36] *See id.*; Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 7–8.

[37] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 7–8.

[38] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Young v. Builders Steel Co.*, 754 F.3d 573, 577–78 (8th Cir. 2014) ("Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a prima facie case of employment discrimination.  To establish a prima facie case for race discrimination, a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently).  Once a plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If the employer meets its burden, the presumption of discrimination disappears, and plaintiff is required to prove the proffered justification is merely a pretext for discrimination." (internal citations and quotations omitted)).  This Court shares the concern of a growing

the alleged adverse action (underpayment) occurred under circumstances giving rise to an inference of discrimination.[39]

One way for a plaintiff to show an inference of discrimination is to point to similarly situated employees of another race that were paid more.[40] Mr. Roston appears to want to pursue this route, identifying as similarly situated white employees Dava Hockings, Donna Heard, and Jason Groves.[41] The problem for Mr. Roston is that there is no evidence in the record that these employees were paid more than Mr. Roston for work at the Paper Mill at the time in question.

---

number of jurists that the *McDonnell-Douglas* framework is an artificial judge-made construct that is both inconsistent with general summary judgment standards and also unmoored from Title VII's (and the ACRA's) statutory language. *See generally Awe v. Harris Health Sys.*, 163 F.4th 969, 975–76 (5th Cir. 2026) (Elrod, J., concurring).

[39] *See Young*, 754 F.3d at 577–78 (setting out requirements of a *prima facie* case for Title VII racial discrimination purposes). The Court acknowledges that there is a more basic challenge presented by the City. The City argues that, for purposes of Title VII and the ACRA, the City was not Mr. Roston's employer with respect to Mr. Roston's work at the Paper Mill. *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 2–3. Both parties agree that *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) and its progeny identify the appropriate test for answering that question. *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 2; Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 4. But they disagree as to *Darden*'s application in this case and as to the facts that inform some of the parts of the governing test. *Compare id.* at 4–5, *with* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 14) at 2–3. The Court need not and does not definitively resolve the "employer" issue. That is because the Court concludes that, even if it were to assume that the City qualifies as Mr. Roston's employer, no reasonable jury could conclude—based on the instant record—that the alleged underpayment at issue occurred under circumstances giving rise to an inference of discrimination. Notwithstanding the Court's decision to forego resolving the "employer" issue, however, the Court does note that there is at least some evidence in the record that the City (exclusively or in conjunction with the Paper Mill) set the relevant rate of pay. *See supra* note 24. And, of course, the City is the entity that ultimately issues the paycheck. *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 30; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 2. The Court's point is this: Although it might end up being very clear at trial that the City is not Mr. Roston's employer with respect to the work he did at the Paper Mill, that is at least a clouded issue here at summary judgment.

[40] *See Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019) ("A common approach to show pretext" for intentional discrimination under *McDonnell Douglas* "is to introduce evidence that the employer treated similarly-situated employees in a disparate manner.")

[41] *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:39:26–9:45:56; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 18. In various places in the record, Dava Hockings is misidentified as David Hawkins. *Contrast* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 2 (identified as David Hawkins), *and* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 18, 25 (same), *with* Def.'s Statement of Undisputed Facts (Doc. 15) ¶ 38 n.1 (clarifying that the Roston deposition transcript misspelled "Dava Hockings" as "David Hawkins"), *and* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 38 (admitting that Dava Hockings is the correct person).

6

(Indeed, there is not even evidence that these three employees worked at the Paper Mill during the time in question.)[42]

Mr. Roston did not submit any of their pay records.[43]   Mr. Roston did not provide declarations from any of them.  Mr. Roston did not depose any of them.  And, in his own deposition testimony, Mr. Roston expressly conceded that he did not know what they were getting paid.[44]  It is true that Mr. Roston testified that he *thought* he was getting paid differently from these three individuals.[45]  But, even putting aside the point that being "paid differently" does not necessarily mean being "paid less," Mr. Roston's personal belief is not evidence.  It is just speculation.[46]

Showing a similarly situated employee of another race who was treated differently is the usual way to raise an inference of discrimination.[47]  But it is not the only way.  And so the Court briefly considers two other arguments pressed by Mr. Roston concerning an inference of

---

[42] As discussed *infra* at note 43, the documentary evidence shows that Mr. Groves did not work at the Paper Mill in or after August 2023.  With respect to Ms. Heard and Ms. Hockings, the City points to record evidence that they never worked at the Paper Mill.  *See* Def.'s Statement of Undisputed Facts (Doc. 15) ¶¶ 39–40; *see* Ex. 2 (Rick Terry Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-2) at 8.  Mr. Roston counters with his own deposition testimony.  *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶¶ 38–40; Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 25.  But that testimony says only that Ms. Hockings and Ms. Heard worked at the Paper Mill.  *See id.*  It does not identify when they did so.

[43] Mr. Roston acknowledges he could have sought such pay records from the City.  *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:45:01–9:45:23.  The Court has pay records for Mr. Groves, which were submitted by the City.  *See id.* at 9:56:02–9:56:15; Ex. 10 (Jason Groves Pay Records) to Def.'s Statement of Undisputed Material Facts (Doc. 15-10) at 1–3.  Those pay records do not show work at the Paper Mill in or after August of 2023.  *See id.*

[44] *See* Ex. 1 (Roston Dep.) to Def.'s Statement of Undisputed Material Facts (Doc. 15-1) at 25.  Mr. Roston also conceded that he did not know how long any of these individuals had been EMTs.  *See id.* at 25–26.

[45] *See id.* at 25.

[46] At oral argument, Mr. Roston made an excellent effort to suggest that Mr. Roston's belief was less speculation and more reasonable inference.  *See* Dec. 2, 2025 Hr'g Tr. (rough) at 9:57:03–9:58:13.  Mr. Roston's point was that, if (a) in late July, Fire Chief Terry promised Mr. Roston he'd be paid $25.50 per hour pursuant to a new contract with the Paper Mill, and (b) in mid-August, shortly after Mr. Roston quit, the Mayor's Secretary called him to do a shift at the Paper Mill for $25.50 per hour, then (c) it is reasonable to infer that any City EMT who worked at the Paper Mill around early August of 2023—including Dava Hockings, Donna Heard, and Jason Groves—got paid the $25.50.  *See id.* at 9:33:45–9:45:56.  Without belaboring things, the Court will simply note that it does not agree with Mr. Roston's position.  In addition to there being no evidence that any of these three individuals worked at the Paper Mill at this particular time, it is just a guess that any of these three individuals were paid $25.50 when Mr. Roston wasn't.

[47] *See, e.g.*, *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009); *Young*, 754 F.3d at 577–78; *Beasley*, 933 F.3d at 938.

discrimination.  First, there is some assertion that Mr. Roston was going to be required to go to the Fire Academy to get firefighter certifications when white co-workers had not been required to do so in the past.[48]  This assertion is underdeveloped in the record, and it is entirely unclear how it logically or sequentially relates to the pay issue.  It does not raise an inference of racial discrimination with respect to the alleged underpayment.  Second, there is the simple fact that Mr. Roston was not paid the $25.50 per hour that had been promised to him by Chief Terry.[49]  But if that were enough to raise an inference of discrimination, then every pay-related breach of contract—whether the asserted contract was oral or written—would make out a *prima facie* case of racial discrimination.[50]  That cannot be and is not the law.

Because Mr. Roston failed to provide evidence from which a reasonable jury could conclude that the alleged underpayment occurred under circumstances giving rise to an inference of discrimination, Mr. Roston cannot make out a *prima facie* case for summary judgment purposes. So, as a matter of law, the City is entitled to summary judgment.[51]

For the reasons stated above, the Court GRANTS Defendant's Motion for Summary Judgment.[52]

IT IS SO ORDERED this 31st day of March 2026.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[48] *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 2, 6–7.  Mr. Roston never attended the Fire Academy.  That fact is undisputed.  *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. 23) ¶ 44.

[49] *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 22) at 2, 5–7.

[50] Every person is a member of some race (or races).  Every underpayment is an adverse action.  And where the issue is underpayment as opposed to termination, it would be extremely unusual for the meeting-legitimate-expectations factor to present a serious hurdle for a plaintiff.  So, if a pay-related breach of contract was enough to raise an inference of discrimination, all of the factors of the *prima facie* case would always be met.

[51] The Court need not (and does not) go on to the second and third steps of the *McDonnell-Douglas* framework.

[52] Def.'s Mot. for Summ. J. (Doc. 13).